UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

UNITED STATES OF AMERICA,
                                       No. 14-cr-168 (MJD/LIB) (1)-(3)

           Plaintiff,

v.                                    **REPORT AND RECOMMENDATION**

Darron Israel Shelton (1),
Quontrell Martell Banner (2),
Kenneth Melvin Vinson (3),

           Defendants.

---

    This matter comes before the undersigned United States Magistrate Judge upon the parties' pretrial motions. This case has been referred to the undersigned Magistrate Judge for report and recommendation, pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1. The Court held a motions hearing on June 27, 2014, regarding the parties' pretrial discovery motions;[1] Defendants' Motions for Severance, [Docket Nos. 37, 63, 64]; Defendant Banner's Motion to Suppress Evidence Obtained as a Result of Search and Seizure, [Docket No. 39]; Defendant Shelton's Motion to Suppress Evidence Obtained as a Result of Search and Seizure, [Docket No. 50]; Defendant Shelton's Motion to Suppress Statements, Admissions, and Answers, [Docket No. 52]; and Defendant Vinson's Motion to Suppress Physical Evidence Obtained as a Result of Illegal Searches, Seizures, or Identification Procedures, [Docket No. 55]. After allowing the parties a supplemental briefing period, the Court took Defendants' motions under advisement as of July 28, 2014. (Order [Docket No. 80]).

    For reasons discussed below, the Court recommends that Defendants' Motions for Severance, [Docket Nos. 37, 63, 64], be **DENIED**; that Defendant Banner's Motion to Suppress

---

[1] The Court addressed the parties' discovery motions in a separate Order, [Docket Nos. 82, 83, 84].

Evidence Obtained as a Result of Search and Seizure, [Docket No. 39], be **DENIED**; that Defendant Shelton's Motion to Suppress Evidence Obtained as a Result of Search and Seizure, [Docket No. 50], be **DENIED**; that Defendant Shelton's Motion to Suppress Statements, Admissions, and Answers, [Docket No. 52], be **DENIED**; and that Defendant Vinson's Motion to Suppress Physical Evidence Obtained as a Result of Illegal Searches, Seizures, or Identification Procedures, [Docket No. 55], be **DENIED**.

## I.   BACKGROUND AND STATEMENT OF FACTS[2]

### A.   Background

Defendants Darron Israel Shelton, Quontrell Martell Banner, and Kenneth Melvin Vinson (collectively, "Defendants") are each charged with one count of Felon in Possession of a Firearm, in violation of 18 U.S.C. §§ 2, 922(g). (Indictment [Docket No. 1]).

### B.   Facts

On February 2, 2014, at approximately 2:11 p.m., St. Cloud Police Patrol Officer Christina Zabrocki ("Officer Zabrocki") was on duty in her marked patrol vehicle when she overheard a report of shots fired in an area approximately 15-20 blocks from Officer Zabrocki's location. Officer Zabrocki immediately responded to the call and proceeded with lights and siren in the direction of the reported location of the shots fired. En route, dispatch reported that the suspect, Antoine Dodd, was reportedly leaving the scene in a white SUV.[3] Officer Zabrocki testified that she was familiar with Antoine Dodd as a result of previous and unrelated police briefings and investigations, and she knew Mr. Dodd to be a black male between the ages of 20 and 40 years old.

---

[2] The facts recounted herein are derived from the June 27, 2014, testimony of St. Cloud Police Patrol Officer Christina Zabrocki and St. Cloud Police Patrol Sergeant Laurie Ellering, and Government Exhibits 1-11 and Defense Exhibits 1-4.

[3] Although dispatch initially reported the involvement of a white Buick, dispatch quickly updated its information and informed Officer Zabrocki that the suspect, Mr. Dodd, would be driving a white <u>SUV</u>.

As Officer Zabrocki proceeded to the reported location of the shots fired, she encountered a white SUV driving in the direction opposite to that which Officer Zabrocki was traveling and away from the reported shots fired scene. Officer Zabrocki slowed her vehicle as the SUV approached and observed three black men in the vehicle as the SUV passed. Officer Zabrocki observed that the occupants were staring at her and seemed "particularly interested in what [she] was doing." Officer Zabrocki immediately made a U-turn and began following the white SUV, lights and siren still on.[4] After falling in-line behind the white SUV, the white SUV gave no indication that it was willing to yield to Officer Zobracki's lights and siren. After traveling for several blocks with no signs of stopping, the white SUV made a left turn and pulled into a parking lot off the street. Officer Zabrocki explicitly noted that the vehicle still did not immediately stop upon entering the parking lot but rather traveled through the parking lot before finally pulling to a stop.

Once the white SUV came to a stop, Officer Zabrocki initiated a "felony stop," as is police procedure when initiating a "high risk" traffic stop in which officers suspect the involvement of firearms or other dangers to officer safety. Several other officers had responded to Officer Zabrocki's location by this time. Officer Zabrocki, gun drawn, ordered the occupants

---

[4] Officer Zabrocki testified that she excluded a second white SUV she observed after making her U-turn from further consideration because its occupants did not match Antoine Dodd's known description as a black male, per Officer Zabrocki's June 27, 2014 testimony:

> **Government**: What about that vehicle or its occupants led you to, if you will, exclude it from your further consideration? I realize it's a quick judgment, but exclude if from your further consideration?
>
> **Officer Zabrocki**: I had actually slowed down and looked in the vehicle, and I knew 100 percent that those people weren't Antoine Dodd.
>
> **Government**: Okay. Because of their physical attributes?
>
> **Officer Zabrocki**: Yes.

(Tr. [Docket No. 75], at 125).

of the SUV to place their hands out of the windows of the vehicle and ordered the driver to drop the vehicle's keys out the window. Officer Zabrocki then ordered the occupants from the vehicle one at a time; each was ordered to walk backward towards a different officer's squad, ordered down on his knees, and placed in handcuffs and secured. The officers ascertained the identity of the three occupants as Defendant Shelton, Defendant Banner, and Defendant Vinson. All three Defendants were cooperative during the execution of the felony stop.

St. Cloud Police Patrol Sergeant Laurie Ellering ("Sergeant Ellering") was also on-duty at approximately 2 p.m. on February 2, 2014, and she, too, overheard the report of shots fired. Sergeant Ellering responded to the scene where Officer Zabrocki had stopped the white SUV, arriving within seconds after Officer Zabrocki's arrival. Sergeant Ellering assisted Officer Zabrocki in executing the felony stop and securing Defendants Shelton, Banner, and Vinson. Immediately after all three Defendants were ordered from the SUV and secured, Sergeant Ellering, together with St. Cloud Police Patrol Officer Nicholas Carlson, approached the white SUV, guns drawn, to "clear" the vehicle of any remaining suspects or other dangers to officer safety. Sergeant Ellering testified that after the three individuals had been secured, she could not be sure that there were no other individuals still hiding in the vehicle. Sergeant Ellering and Officer Carlson "cleared" the vehicle by looking through its windows and the doors which the occupants had left open when exiting the vehicle. Within seconds of approaching the vehicle to clear it, Officer Carlson, squatting outside of the vehicle, peered through the open back passenger door and observed an uncased firearm under the backseat on the passenger side. Sergeant Ellering specifically testified that she also observed the firearm from her position standing outside of the vehicle and that the firearm was in plain, unobstructed view under the seat.

## II.    DEFENDANTS' MOTIONS FOR SEVERANCE, [DOCKET NOS. 37, 63, 64]

Defendants, individually and separately, move the Court for an order severing their respective cases for trial, pursuant to Rule 14 of the Federal Rules of Criminal Procedure. (See [Docket Nos. 37, 63, 64]). Specifically, Defendant Banner argues that, "[t]he defenses to be presented on behalf of Defendant Banner are going to be significantly antagonistic as to those of the co-defendants as it relates to position of the weapons in the vehicle, realistic knowledge of those weapons, the significance of who reasonably could have placed the weapons in the positions as they were found in the vehicle." (Banner Supp. Mem. [Docket No. 86], at 8). Defendant Shelton similarly argues that severance is appropriate because the Defendants intend to employ "mutually antagonistic defenses" that would result in jury prejudice. (See [Docket Nos. 63, 88]). Defendant Vinson, too, argues that his defense will be antagonistic to the anticipated defenses of his co-Defendants and that a joint trial would result in prejudice to Defendant Vinson and negatively impact Vinson's decision regarding whether to exercise his right to testify. (See [Docket Nos. 64, 87]).

### A.    Standard of Review

An indictment may charge two or more defendants "if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Fed. R. Crim. P. 8(b). "For proper joinder under this provision, it is not necessary that every defendant have participated in or be charged with each offense." United States v. Warfield, 97 F.3d 1014, 1019 (8th Cir. 1996) (quotations and citation omitted).

Rule 14 of the Federal Rules of Criminal Procedure provides that if joinder pursuant to Rule 8 creates prejudice to either the Government or a defendant, a court may sever a trial "or

provide any other relief that justice requires." Fed. R. Crim. P. 14(a). However, "[i]f, under Rule 8, joinder is proper, then the defendant seeking severance has a 'heavy burden' in demonstrating that a joint trial will impermissibly infringe his right to a fair trial." United States v. Hopkins, No. 11-cr-230 (DWF/SER), 2011 U.S. Dist. LEXIS 127071, at *25-26 (D. Minn. Oct. 5, 2011) (Rau, M.J.) (citing Warfield, 97 F.3d at 1019), adopted by 2011 U.S. Dist. LEXIS 124904 (D. Minn. Oct. 26, 2011) (Frank, J.). "There is a preference in the federal system for joint trials of defendants who are indicted together." Zafiro v. United States, 506 U.S. 534, 537 (1993); see also United States v. Clay, 579 F.3d 919, 927 (8th Cir. 2009). "Joint trials play a vital role in the criminal justice system," because they achieve certain efficiencies, and because they "avoid[] the scandal and inequity of inconsistent verdicts." Richardson v. Marsh, 481 U.S. 200, 209-10 (1987). "Only in an unusual case will the prejudice resulting from a joint trial be substantial enough to outweigh the general efficiency of joinder." Clay, 579 F.3d at 927 (citing United States v. Al-Esawi, 560 F.3d 888, 891 (8th Cir. 2009)). "The risk of prejudice posed by joint trials is best cured by careful and thorough jury instructions." United States v. Mickelson, 378 F.3d 810, 818 (8th Cir. 2004).

### B.       Analysis

All three Defendants have seemingly abandoned any potential, generic argument regarding improper joinder under Rule 8(b), arguing instead generically that their "mutually antagonistic defenses" will prevent the jury from making a reliable judgment regarding the Defendants' respective guilt or innocence, resulting in prejudice and warranting severance. Because the Court finds that joinder is indeed proper under Rule 8, and because Defendants make no arguments to the contrary, Defendants bear a heavy burden in demonstrating that a joint

trial will impermissibly infringe on their rights to a fair trial and overcoming the preference for a joint trial.

First and most significantly, mutually antagonistic defenses are not prejudicial *per se* and do not automatically warrant severance. <u>Zafiro</u>, 506 U.S. at 538. In fact, even <u>demonstrated</u> prejudice (which requires more than mere allegations of the existence of mutually antagonistic defenses) does not automatically warrant severance; rather, courts, in their discretion, are called upon to tailor relief as they deem appropriate. <u>Id.</u>

In the present case, Defendants simply allege generally the anticipated existence of mutually antagonistic defenses in support of their respective motions for severance. In so doing, Defendants fail to articulate or demonstrate any specific prejudice attributable to a joint trial, contending only that the nature of their respective defenses will cause prejudice generally and arguing only in conclusory terms. Even assuming, *arguendo*, that Defendants' anticipated defenses <u>are</u> indeed mutually antagonistic – which the Court cannot confirm at this time on the present record – and even assuming that their defenses do indeed seek to shift culpability to co-Defendants, as is implied in Defendants' briefing,

> [t]he mere fact that one defendant tries to shift blame to another defendant does not mandate separate trials, as a codefendant frequently attempts to point the finger, to shift the blame, or to save himself at the expense of the other. Similarly, the possibility that a defendant's chances for acquittal may be better in a separate trial is an insufficient justification for severance.

<u>United States v. Flores</u>, 362 F.3d 1030, 1039-40 (8th Cir. 2004) (internal citations and quotations omitted). "[I]t is well settled that defendants are not entitled to severance merely because they may have a better chance of acquittal in separate trials." <u>Zafiro</u>, 506 U.S. at 540 (citing <u>United States v. Martinez</u>, 922 F.2d 914, 922 (1st Cir. 1991); <u>United States v. Manner</u>, 887 F.2d 317, 324 (D.C. Cir. 1989), cert. denied, 493 U.S. 1062, 110 S. Ct. 879, 107 L.Ed.2d 962 (1990)). By

arguing only in non-specific, generic terms that mutually antagonistic defenses warrant severance, Defendants fail to carry their "heavy burden" in overcoming the preference to conduct a joint trial. "The mere fact that there is hostility among the defendants, or one defendant may try to save himself at the expense of another is not sufficient grounds to require separate trials." United States v. Boyd, 610 F.2d 521, 526 (8th Cir. 1979).

Additionally, although Defendants offer no specific arguments to this effect, the Court is mindful that "Defendants have a Sixth Amendment right to confront witnesses against them, and a Fifth Amendment right not to be made witnesses against themselves. 'In a joint trial, these rights collide when co-defendants implicate each other in confessions that are introduced into evidence.'" United States v. Banks, No. 11-cr-173 (MJD/JJK), 2011 U.S. Dist. LEXIS 77703, at *5 (D. Minn. July 1, 2011) (Keyes, M.J.), adopted by 2011 U.S. Dist. LEXIS 77195 (D. Minn. July 15, 2011) (Davis, C.J.). In Bruton v. United States, the petitioner and a co-defendant had been convicted of armed robbery in a joint trial after a postal inspector testified that Bruton's co-defendant had confessed and had "expressly implicat[ed]" the petitioner. 391 U.S. 123, 124, 124 n.1 (1968). The trial court instructed the jury that the co-defendant's confession "if used, can only be used against the [co-defendant]. It is hearsay insofar as the [petitioner] is concerned, and you are not to consider it in any respect to the [petitioner], because insofar as he is concerned it is hearsay." Id. at 125 n.2. The Supreme Court, however, concluded that,

> the introduction of [the co-defendant's] confession posed a substantial threat to petitioner's right to confront the witnesses against him, and this is a hazard we cannot ignore. Despite the concededly clear instructions to the jury to disregard [the co-defendant's] inadmissible hearsay evidence inculpating petitioner, in the context of a joint trial we cannot accept limiting instructions as an adequate substitute for petitioner's constitutional right of cross-examination. The effect is the same as if there had been no instruction at all.

Id. at 137. For that reason, the Supreme Court reversed the petitioner's conviction in Bruton. Id. at 126, 137.

However, even the Bruton court suggested that redaction from co-conspirator testimony may be sufficient to cure any prejudice caused by the introduction of a co-defendant's incriminating statement, and acknowledged that "[n]ot every admission of inadmissible hearsay or other evidence can be considered to be reversible error unavoidable through limiting instructions." Id. at 134 n.10, 135. In Richardson v. Marsh, 481 U.S. 200 (1987), the Supreme Court further distinguished between co-defendant statements that are "facially incriminating," and statements which merely are "incriminating by connection." Id. at 209. When a co-defendant's statement is facially incriminating of the defendant, redaction or even severance may be required because it is more difficult for jurors to set aside such evidence. Id. at 208. However, the Court rejected the suggestion that the rule in Bruton extend to confessions that are incriminating by connection as both impractical and unnecessary. Id. at 208-09.

In the present case, none of the Defendants identifies any specific "facially incriminating" co-Defendant statements that he believes would, if introduced at trial, prejudice him. Even if Defendants had identified one or more facially incriminating statements made by a co-Defendant, "Bruton can be complied with by redaction – a possibility suggested in that opinion itself." Richardson, 481 U.S. at 209 (citing Bruton, 391 U.S. at 134 n.10). Nor has any Defendant articulated any specific reason why the jury would be unable to compartmentalize any such redacted evidence upon being given proper instructions to do so.

As expressed by the United States Supreme Court in Zafiro, 506 U.S. 534, and Richardson, 481 U.S. 200; and by the Eighth Circuit in Clay, 579 F.3d 919; Al-Esawi, 560 F.3d 888; and Warfield, 97 F.3d 1014; and by the District of Minnesota in Hopkins, 2011 U.S. Dist.

LEXIS 127071, and as previously noted herein, there is a strong preference in the federal courts for joint trials. Given that preference, and at this very early juncture, where Defendants can only invite the Court to speculate as to what evidence the Government might actually seek to introduce at trial, or whether any of the Defendants will ultimately refuse to testify in his own defense thereby denying his co-Defendants an opportunity to cross examine, severance is not at this time appropriate: "Severance is a remedy that can be provided at the time of trial if appropriate under the circumstances. At present the motion for severance based upon speculative grounds is therefore premature." United States v. Billups, No. 06-cr-129 (PJS/AJB), 442 F. Supp. 2d 697, 706 (D. Minn. 2006) (Boylan, M.J.); see also Banks, 2011 U.S. Dist. LEXIS 77703, at *7 ("Bruton protections can be re-evaluated" before trial "or at trial when actual testimony is proffered").

As a result of the foregoing, the Court finds that Defendants have failed to carry their heavy burden in overcoming the preference for a joint trial, and the Court recommends that Defendants' Motions for Severance, [Docket Nos. 37, 63, 64], be **DENIED** without prejudice.

III.   **DEFENDANT BANNER'S MOTION TO SUPPRESS EVIDENCE OBTAINED AS A RESULT OF SEARCH AND SEIZURE, [DOCKET NO. 39]; DEFENDANT SHELTON'S MOTION TO SUPPRESS EVIDENCE OBTAINED AS A RESULT OF SEARCH AND SEIZURE, [DOCKET NO. 50]; AND DEFENDANT VINSON'S MOTION TO SUPPRESS PHYSICAL EVIDENCE OBTAINED AS A RESULT OF ILLEGAL SEARCHES, SEIZURES, OR IDENTIFICATION PROCEDURES, [DOCKET NO. 55]**

Upon review of the parties' representations (through counsel) on the record at the June 27, 2014, pretrial motions hearing and in their written submissions to the Court, the Court finds that each of the three Defendants has narrowed and focused his respective motion to suppress evidence, [Docket Nos. 39, 50, 55], to two discrete issues: (1) the legality of Officer Zabrocki's initial stop of the Defendants' vehicle; and (2) the legality of Officer Carlson's and Sergeant

Ellering's subsequent "search" of the vehicle that resulted in discovery of a firearm beneath the backseat of the Defendants' SUV. Defendants do not directly challenge the legality of any other specific searches and/or seizures – including but not limited to the seizure, detention, and eventual arrest of Defendants; the search of and seizure of evidence from their white SUV; and the resulting search warrants and the executions thereof. Rather, Defendants move the Court for an order suppressing other evidence only to the extent that it may be considered "fruit of the poisonous tree" derived from either Officer Zabrocki's potentially illegal vehicle stop or Officer Carlson's and Sergeant Ellering's potentially illegal vehicle "search."

**A.     Vehicle Stop**

**1.     Standard of Review**

The Fourth Amendment guarantees the "right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. AMEND. IV. "A traffic stop constitutes a 'seizure' within the meaning of the Fourth Amendment." United States v. Martinez, 358 F.3d 1005, 1009 (8th Cir. 2004) (citing Delaware v. Prouse, 440 U.S. 648, 653 (1979)). The principles of Terry v. Ohio, 392 U.S. 1 (1968), govern traffic stops. United States v. Jones, 269 F.3d 919, 924 (8th Cir. 2001). "Generally, a traffic stop must be supported by at least a reasonable, articulable suspicion that criminal activity has occurred or is occurring." United States v. Fuse, 391 F.3d 924, 927 (8th Cir. 2004); see also United States v. Cortez, 449 U.S. 411, 417 (1981) ("An investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity"). "[T]he standard employed is less demanding than the standard of probable cause that governs arrests and full-scale Fourth Amendment searches, both with respect to the amount of supporting information that is required to establish reasonable suspicion and with respect to the degree of reliability that

the information must exhibit." United States v. Spotts, 275 F.3d 714, 718 (8th Cir. 2002) (citing Alabama v. White, 496 U.S. 325, 330 (1990)); see, e.g., United States v. Sokolow, 490 U.S. 1, 7 (1989); United States v. Bell, 480 F.3d 860, 863 (8th Cir. 2007).

Courts have refused to create a "finely-tuned standard" or "a neat set of legal rules" as to what constitutes reasonable, articulable suspicion. Ornelas v. United States, 517 U.S. 690, 696, 703 (1996). Therefore, the standard remains an "elusive concept." Cortez, 449 U.S. at 417. Accordingly, a court may find reasonable suspicion justifying a traffic stop when the "totality of the circumstances" demonstrates that the detaining officer had a "particularized and objective basis for suspecting legal wrongdoing." Jones, 606 F.3d at 966. "This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." United States v. Stewart, 632 F.3d 453, 457 (8th Cir. 2011) (quoting Cortez, 449 U.S. at 418).

### 2.      Analysis

Evaluating the totality of the circumstances, Officer Zabrocki had a reasonable, articulable suspicion that criminal activity had occurred sufficient to justify her initial stop of Defendants' white SUV on February 2, 2014.

Immediately after overhearing the shots fired dispatch, Officer Zabrocki proceeded in the direction of the scene. En route, Officer Zabrocki received updated information from dispatch, via the 9-1-1 caller, that the shots fired suspect was reported to be Antoine Dodd and that he would be driving a white SUV. From her personal experience while an officer with the St. Cloud Police Department, Officer Zabrocki knew Antoine Dodd to be a black male between the ages of 20 and 40. En route to the reported scene of shots fired, Officer Zabrocki encountered a white SUV traveling away from the location of the reported shooting, reported to have occurred only a

mere few minutes earlier. Officer Zabrocki slowed her vehicle and observed three black males in the white SUV, matching the description of the suspect; the men clearly noticed Officer Zabrocki and, by Officer Zabrocki's testimony, seemed particularly interested in her actions. Video from Officer Zabrocki's dash cam reveals that the SUV did not yield to Officer Zabrocki, despite the fact that her lights and siren were on, but rather made the first possible turn it could to get off of the road on which Officer Zabrocki was traveling.

When evaluating a law enforcement officer's reasonable, articulable suspicion, the Court may consider "the temporal and geographic proximity of [a] car to the scene of the crime, the matching description of the vehicle, and the time of the stop." United States v. Juvenile TK, 134 F.3d 889, 903 (8th Cir. 1998). In this case, Defendants' SUV (1) was located close in time and proximity to the reported shots fired incident, (2) matched the description Officer Zabrocki had of the suspect's vehicle, and (3) passed Officer Zabrocki on the road mere minutes following the incident, traveling away from the shots fired scene. Significantly, the described events happened in very short order. Officer Zabrocki reacted and responded immediately each step of the way and followed "in progress" leads. Having been advised by dispatch that a white SUV was involved in the shots fired call, and having been advised by dispatch as to a description of the anticipated driver of the white SUV, Officer Zabrocki proceeded to the location, spotted a vehicle and occupants matching the description provided by the 9-1-1 caller and dispatch, and, thus, initiated a traffic stop shortly thereafter.[5]

---

[5] The Court further notes that Officer Zabrocki initiated the traffic stop after the vehicle committed a traffic violation (failure to yield to an emergency vehicle with lights and siren on). The Court could find that the reasonable, articulable suspicion of the traffic violation alone supports the initial stop, but considered in conjunction with the other information known to Officer Zabrocki under the totality of the circumstances that criminal activity occurred as associated with the shots fired call provides even stronger support for the traffic stop. "[S]o long as police have probable cause to believe that a traffic violation has occurred, the stop is valid. . . ." United States v. Rosas, No. 11-cr-188 (RHK/SER), 2011 WL 7046028 (D. Minn. Nov. 23, 2011), report and recommendation adopted in part, No. 11-cr-188 (RHK/SER), 2012 WL 124970 (D. Minn. Jan. 17, 2012) (citing United States v. Thomas, 93 F.3d 479,

Not only did Defendants' physical description match that of the reported suspect (Dodd) known to Officer Zabrocki and their SUV match the description of the vehicle reportedly involved in the shooting, Defendants further failed to yield to Officer Zabrocki. The Defendants' SUV acted in violation of Minn. Stat. § 169.20, subd. 5, which requires drivers to pull to the far right side of a road when an emergency vehicle, with lights and siren activated, is passing. The SUV exhibited non-compliant behavior. The SUV further did not stop, slow down, or yield to the squad car, even after Officer Zabrocki had positioned herself directly behind the Defendants' vehicle. Only after driving several blocks and through an alley/parking lot did the vehicle finally come to a stop when Defendants were unable to extract themselves from the parking lot.

The totality of the circumstances indicates that Officer Zabrocki had a particularized and objective basis for reasonably suspecting the white SUV of being involved in criminal activity. As such, Officer Zabrocki had the requisite reasonable suspicion to initiate the traffic stop under Terry v. Ohio.

The fact that Officer Zabrocki executed what she referred to as a "felony stop" does not change the analysis as to whether this initial stop was proper under the Fourth Amendment.

"After stopping a vehicle, an officer is 'entitled to conduct an investigation reasonably related in scope to the circumstances that prompted it.'" United States v. Rosas, No. 11-cr-188 (RHK/SER), 2011 WL 7046028, at *7 (D. Minn. Nov. 23, 2011) (citing United States v. Collier, 419 Fed. Appx. 682, 684 (8th Cir. 2011) (internal citations omitted)). Given the circumstances that prompted the traffic stop – namely, reason to believe that the white SUV and its occupants were involved in a shots fired report, and that, accordingly, weapons may be on board – the officers reasonably engaged in a "felony" traffic stop, necessary for their own protection and in

---

485 (8th Cir. 1996); see United States v. Olivera–Mendez, 484 F.3d 505, 509 (8th Cir. 2007) (allowing officers to stop a vehicle if the officer(s) have probable cause that a traffic violation occurred)).

proportion to the nature of the suspected criminal activity. During any investigative stop, "officers may take steps reasonably necessary to protect their personal safety." United States v. Shranklen, 315 F.3d 959, 961 (8th Cir. 2003). In light of the nature of the suspected crime of shots fired, as well as the possibility therefore that firearms may be inside the vehicle, the officers' actions were reasonably necessary to maintain the status quo, protect the officers, and allow them to conduct a stop of the vehicle immediately and without interference. See United States v. Navarrete–Barron, 192 F.3d 786, 791 (8th Cir. 1999) (holding officers' actions of drawing firearms while approaching defendant's vehicle, handcuffing vehicle's occupants, and placing them in a police unit were reasonable given officers' reasonable suspicion the vehicle's occupants "had been or were engaged in drug trafficking, which very often is accompanied by dangerous weapons"); Bell, 480 F.3d at 864  (holding that officers' conduct in drawing their weapons and ordering defendant out of the vehicle and onto the ground, handcuffing him, and detaining him were justified and did not exceed the legitimate bounds of the stop in light of the suspected crime of possessing stolen firearms).

Because Officer Zabrocki had reasonable, articulable suspicion under the totality of the circumstances that criminal activity had occurred, and because she had a particularized and objective basis for suspecting Defendants' white SUV was involved in the wrongdoing and initiating the traffic stop, the Court recommends that Defendants' motions to suppress evidence, [Docket Nos. 39, 50, 55], be **DENIED** with respect to the initial traffic stop by Officer Zabrocki.

### B.      Vehicle "Search" Revealing the First Firearm

Because the Court finds that Officer's Zabrocki's vehicle stop was constitutional and supported by reasonable suspicion, the Court next determines whether Officer Carlson's

subsequent alleged "search" of the vehicle – which allowed for discovery of the firearm located beneath the backseat – was constitutional.

### 1.    Standard of Review

Again, the Fourth Amendment protects individuals from unreasonable searches and seizures. "[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions." United States v. Davis, 569 F.3d 813, 816 (8th Cir. 2009) (citing Katz v. United States, 389 U.S. 347, 357 (1967)). However, "[i]f an article is already in plain view, neither its observation nor its seizure would involve any invasion of privacy." Horton v. California, 496 U.S. 128, 133, 110 S. Ct. 2301, 2306, 110 L. Ed. 2d 112 (1990). "[A] truly cursory inspection – one that involves merely looking at what is already exposed to view, . . . – is not a 'search' for Fourth Amendment purposes, and therefore does not even require reasonable suspicion." United States v. Hatten, 68 F.3d 257, 261 (8th Cir. 1995) (quoting Arizona v. Hicks, 480 U.S. 321, 328, 107 S. Ct. 1149, 1154, 94 L.Ed.2d 347 (1987)).

### 2.    Analysis

Officer Carlson's discovery of the firearm beneath the backseat of the SUV was not precipitated by a search as defined by the Fourth Amendment. The act of looking through a car window (or an open car door) is not a search for Fourth Amendment purposes because "a person who parks a car – which necessarily has transparent windows – on private property does not have a reasonable expectation of privacy in the visible interior of his car." United States v. Bynum, 508 F.3d 1134, 1137 (8th Cir. 2007) (citing Hatten, 68 F.3d at 261, citing Texas v. Brown, 460 U.S. 730, 740, 103 S. Ct. 1535, 75 L.Ed.2d 502 (1983)). "Neither probable cause nor reasonable suspicion is necessary for an officer to look through a window (or open door) of a vehicle so

long as he or she has a right to be in close proximity to the vehicle." <u>United States v. Bynum</u>, 508 F.3d 1134, 1137 (8th Cir. 2007).

For reasons discussed in the previous section, <u>see</u> Section III.A.2, Officer Carlson and Sergeant Ellering had a right to be in close proximity to the Defendants' SUV, while engaged in the constitutional felony stop and "clearing" of the vehicle in the interests of officer safety. Nothing in the present record before the Court indicates that Officer Carlson physically entered the vehicle, opened any closed compartments within the vehicle, moved any items in the vehicle to secure a better line of sight to the firearm, or otherwise exceeded the reasonable scope of the felony stop and "clearing" of the vehicle. To the contrary, both Sergeant Ellering's testimony and Officer Carlson's dash cam footage, (<u>see</u> Gov't Ex. 1b), indicate that Officer Carlson approached the SUV, remained outside of the Defendants' SUV, and was able to view the firearm simply by crouching next to the open passenger door (left ajar by Defendant Shelton when exiting the vehicle). In further support of the fact that Officer Carlson discovered the firearm not by conducting a physical search of the interior of the vehicle but simply by lawfully approaching the vehicle is the fact that he observed the firearm within mere <u>seconds</u> of approaching the vehicle to "clear" it. (Gov't Ex. 1b).

To be clear, Defendants only challenge Officer Carlson's initial "search" – a misnomer, as just discussed – of their SUV that led to the observation and discovery of the first firearm; as Sergeant Ellering testified, law enforcement did not immediately <u>seize</u> the firearm upon its initial discovery, and regardless, Defendants do not challenge its <u>seizure</u>. (Tr. [Docket No. 75], at 165). Defendants have not placed any <u>seizure</u> of evidence from the vehicle at issue before the Court, save for any potential "fruit of the poisonous tree" implications Officer Zabrocki's initial vehicle

stop and/or Officer Carlson's alleged vehicle "search" when he looked through the open car door may have had on subsequently seized evidence.

Nothing in the present record before the Court implicates the Fourth Amendment with respect to Officer Carlson's discovery of the firearm. Because Officer Carlson did not conduct a search of the vehicle as defined by the Fourth Amendment, the Court recommends that Defendants' motions to suppress evidence, [Docket Nos. 39, 50, 55], be **DENIED** with respect to the alleged vehicle "search."

### C.      Search Warrants

At the June 27, 2014, motions hearing, Defendants represented on the record that they intended to challenge the constitutionality of the search warrants issued in the present case, but only via a "four-corners" challenge concerning the sufficiency of the probable cause articulated in each of the warrants' supporting affidavits. Defendants declined the opportunity to specifically and directly address the search warrants in their supplemental, post-hearing briefing, arguing only in passing that the Court should suppress the search warrants as "fruit of the poisonous tree," i.e., applied for and executed only as a result of an illegal vehicle stop (by Officer Zabrocki) and/or an illegal vehicle "search" (by Officer Carlson).

Because, as discussed above, the Court finds that law enforcement did not conduct any illegal or unconstitutional searches and/or seizures, the "fruit of the poisonous tree" doctrine is inapplicable. However, in an abundance of caution, the Court will undertake a four-corners review of the search warrants issued in the present case.

### 1.      Standard of Review

As articulated above, the Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures,"

and that "no warrants shall issue, but upon probable cause, supported by Oath or affirmation."

U.S. CONST. AMEND. IV. The Eighth Circuit has held that "[a]n affidavit for a search warrant

need only show facts sufficient to support a finding of probable cause." United States v. Parker,

836 F.2d 1080, 1083 (8th Cir. 1987). Probable cause exists when "a practical, common-sense"

evaluation of "all the circumstances set forth in the affidavit" demonstrates "a fair probability

that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462

U.S. 213, 238 (1983). "Probable cause is a fluid concept that focuses on 'the factual and practical

considerations of everyday life on which reasonable and prudent men, not legal technicians,

act.'" United States v. Colbert, 605 F.3d 573, 576 (8th Cir. 2010) (quoting Gates, 462 U.S. at

231). "The existence of probable cause depends on whether, in the totality of the circumstances,

'there is a fair probability that contraband or evidence of a crime will be found in a particular

place.'" United States v. Solomon, 432 F.3d 824, 827 (8th Cir. 2005) (quoting United States v.

Murphy, 69 F.3d 237, 240 (8th Cir. 1995) (quoting, in turn, Gates, 462 U.S. at 238)).

     As alluded to above, the sufficiency of a search warrant affidavit is examined using

"common sense and not a hypertechnical approach." United States v. Grant, 490 F.3d 627, 632

(8th Cir. 2007) (citation and internal quotations omitted). "Therefore, '[w]hen the [issuing judge]

relied solely upon the supporting affidavit to issue the warrant, only that information which is

found in the four corners of the affidavit may be considered in determining the existence of

probable cause.'" United States v. Wiley, No. 09-cr-239 (JRT/FLN), 2009 WL 5033956, at *2

(D. Minn. Dec. 15, 2009) (Tunheim, J.) (quoting Solomon, 432 F.3d at 827; edits in Wiley). "In

ruling on a motion to suppress, probable cause is determined based on 'the information before

the issuing judicial officer.'" United States v. Smith, 581 F.3d 692, 694 (8th Cir. 2009) (quoting

United States v. Reivich, 793 F.2d 957, 959 (8th Cir. 1986)). Nevertheless, "[a] magistrate's

'determination of probable cause should be paid great deference by reviewing courts,'" <u>Gates</u>, 462 U.S. at 236 (<u>quoting</u> <u>Spinelli v. United States</u>, 393 U.S. 410, 419 (1969)). "[T]he duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for . . . [concluding]' that probable cause existed." <u>Gates</u>, 462 U.S. at 238-39 (<u>quoting</u> <u>Jones v. United States</u>, 362 U.S. 257, 271 (1960)).

**2.      Analysis**

Defendants' motions do not specifically target or individually address directly any of the search warrants now at issue before the Court. Because Defendants have offered no sufficiently specific factual or legal grounds for suppression, the Court could recommend summarily denying Defendants' motions to suppress with respect to the search warrants solely on the basis that Defendants have failed to meet their burden of production. <u>United States v. Jones</u>, No. 09-cr-260 (DWF/RLE), 2009 WL 4723341, at *4 (D. Minn. Dec. 2, 2009) (Erickson, C.M.J.) (<u>citing</u> <u>United States v. Mims</u>, 812 F.2d 1068, 1074 (8th Cir. 1987); <u>United States v. Quiroz</u>, 57 F. Supp. 2d 805, 822-23 (D. Minn. 1999) (Mason, M.J.), adopted by 57 F. Supp. 2d 805, 811 (D. Minn. 1999) (Kyle, J.)). "Nonetheless, in an abundance of caution, we proceed with address[ing] the merits of the Defendant's Motion . . . ." <u>Id.</u> (<u>citing</u> <u>United States v. Edwards</u>, 563 F. Supp. 2d 977, 995 (D. Minn. 2008) (Mayeron, M.J.), <u>adopted by</u> 563 F. Supp. 2d 977, 984 (D. Minn. 2008) (Frank, J.).

**a.      Three Search Warrants for the Contents of Defendants' Cell Phones**

Based on the information provided in St. Cloud Police Officer Roger Baumann's supporting affidavits, the Court finds sufficient evidence to conclude that the issuing judge had a substantial basis upon which to conclude that probable cause existed for the issuance of three

February 4, 2014, search warrants for the contents of Defendants' respective cell phones. (Gov't Exs. 6, 7, 8).

The affidavit in support of each of the three applications for the search warrants is virtually identical. The affiant, Roger Baumann, states that he is a licensed police officer with the City of St. Cloud and is currently assigned to the Central Minnesota Violent Offender Task Force (VOTF). Officer Baumann states that he has been involved in numerous investigations regarding violent crimes and shootings and recounts his relevant experience and training.

Officer Baumann recounts the relevant events of February 2, 2014, including the St. Cloud Police Department's receipt of a 9-1-1 call from a female reporting that her boyfriend had been shot at; officers' receipt of information concerning the involvement of (1) a white SUV with "habitat license plates" and (2) Antoine Dodd; Officer Zabrocki's identification of a white SUV with habitat license plates near the location of the shots fired and her subsequent stop of the SUV; the felony stop and contemporaneous detention and identification of the three occupants of the SUV; and Officer Carlson's observation of the firearm beneath the seat in the SUV when clearing the SUV. The affidavit further states that following Officer Carlson's discovery of the first firearm, Sergeant Ellering conducted a search of the vehicle and discovered a second firearm. The affidavit states that officers arrested Shelton and Vinson at the scene for being felons in possession of a firearm. Officers released Banner at the scene, but the affidavit states that he remained a suspect in the on-going investigation.

Law enforcement applied for and executed one search warrant for each Defendant's cell phone(s):

1. Government Exhibit 6: Search warrant application and warrant authorizing the search of a black Virgin Mobile LG cellular phone, taken from Darron Israel Eltarach Shelton upon

his detention on February 2, 2014, and retained as evidence at the St. Cloud Police Department, for any and all information stored within the cellular phone;

2. Government Exhibit 7: Search warrant application and warrant authorizing the search of an Apple iPhone 4 cellular phone taken from Quontrell Martell Banner upon his detention on February 2, 2014, and retained as evidence at the St. Cloud Police Department, for any and all information stored within the cellular phone; and

3. Government Exhibit 8: Search warrant application and warrant authorizing a search of a white Samsung T-Mobile cellular phone and a black Samsung cellular phone, taken from Kenneth Melvin Vinson upon his detention on February 2, 2014, and retained as evidence at the St. Cloud Police Department, for any and all information stored within the cellular phones.

Officer Baumann's affidavit in support of each of the search warrant applications articulates a sufficient basis upon which to find that probable cause existed to conclude that the search would uncover evidence of a crime, and to, accordingly, issue the warrants for the search Defendants' respective cell phones. See Gates, 462 U.S. at 236. See, e.g., United States v. Derden, No. 12-cr-12 (PJS/SER), 2012 WL 1952257 (D. Minn. Apr. 16, 2012) report and recommendation adopted, 12-cr-12 (PJS/SER), 2012 WL 1948765 (D. Minn. May 30, 2012) (finding search warrant for cell phone and phone's contents supported by probable cause when the affidavit described the underlying robbery and subsequent investigation and knowledge of the existence of the cell phone).

Because the Court finds that the issuing judge had a substantial basis upon which to conclude that probable cause existed for the issuance of three February 4, 2014, search warrants for the contents of Defendants' respective cell phones. (Gov't Exs. 6, 7, 8), the Court

recommends that Defendants' motions to suppress, [Docket Nos. 39, 50, 55], be **DENIED** with respect to the three cell phone search warrants at issue in the present case.

**b.      Three Search Warrants for Defendants' DNA**

Also at issue before the Court, subject to four-corners review, are three search warrants for Defendants' DNA:

1.  Government Exhibit 9: Search warrant application and warrant authorizing the search of Darron Shelton's person for DNA evidence;

2.  Government Exhibit 10: Search warrant application and warrant authorizing the search of Quontrell Banner's person for DNA evidence;

3.  Government Exhibit 11: Search warrant application and warrant authorizing the search of Kenneth Vinson's person for DNA evidence.

Officer Baumann submitted a virtually identical affidavit in support of each of his applications for warrants for Defendants' DNA, which is virtually identical to the affidavits submitted in support of his applications for the cell phone warrants, the details of which have already been articulated above. However, based on the information provided in the supporting affidavit, the Court concludes that probable cause did <u>not</u> exist for the issuance of the three February 3, 2014, mouth swab warrants.

Compelling an accused to give a DNA sample is a search within the meaning of the Fourth Amendment. <u>Padgett v. Donald</u>, 401 F.3d 1273, 1277 (11th Cir. 2005) (swabbing inmates' cheeks for saliva to create a DNA database is a search within the meaning of the Fourth Amendment); <u>Schlicher v. Peters</u>, 103 F.3d 940, 942-43 (10th Cir. 1996) (taking a saliva sample for DNA information is a search within the meaning of the Fourth Amendment); <u>see also</u> <u>United States v. Kraklio</u>, 451 F.3d 922, 923 (8th Cir. 2006) (drawing blood for a DNA sample

constitutes a search). Using a swab to extract DNA from a defendant's cheek is invasive; an individual's DNA reveals private medical information, and the act of reaching into the subject's mouth to conduct the swab is an invasion into the body. United States v. Lassiter, 607 F. Supp. 2d 162, 165 (D.D.C. 2009).

Although few courts have considered the issue of whether a warrant for a saliva sample requires proof that DNA evidence exists on the item seized (to which the buccal swab is to be compared), the Court finds guidance in United States v. Pakala, 329 F. Supp. 2d 178 (D. Mass. 2004), and has turned to this case in the past. See United States v. Robinson, No. 11-cr-325(1) (DWF/LIB), 2012 WL 948670, at *1 (D. Minn. Mar. 20, 2012). In Pakala, the court granted the Government's motion to compel handprints, palm prints, fingerprints, and DNA samples from the defendant. Pakala, 329 F. Supp. 2d at 182. In issuing its order, the court observed that the Government had made the required showing of probable cause that the defendant handled the weapon at issue. Id. at 179. Significantly, the court held that the DNA samples could not have been compelled unless the Government first produced evidence demonstrating that the substance on the firearm produced a sufficient DNA sample. Id. at 181.

Similarly, in United States v. Roberts, No. 10-mj-458 (LIB), this Court refused to order a defendant to submit to fingerprinting, palm printing, and/or DNA sampling without a showing by the Government first of "some nexus between the bodily evidentiary items to be seized and the criminal activity." (Order [Docket No. 15], at 7). The Court found it troubling that the Government had not "even tested the firearm at issue in this case to see whether there are any retrievable fingerprints or DNA testing evidence to which any comparison can be made." Id.

Probable cause in this situation – i.e., mouth swab warrants – requires a demonstration of a reasonable ground for belief that the Defendants' DNA may match what has been found on the

firearms seized by law enforcement. <u>Lassiter</u>, 607 F. Supp. 2d at 166 (stating that probable cause requires a showing that a reasonable ground for belief exists that the defendant's DNA will match DNA located on the evidence before granting the Government's motion to compel the defendant to provide a DNA sample).

In the present case, Officer Baumann's supporting affidavits fail to state that any DNA had in fact already been recovered from any evidence. Rather, the affidavits merely state only that Defendants' DNA will be compared to "DNA that <u>may</u> be located on the handguns." (Gov't Exs. 9, 10, 11, at 2) (emphasis added). The affidavits provide no evidence that law enforcement had even yet tested the firearm(s) at issue to see whether there was any retrievable DNA evidence to which any comparison of the DNA sample seized from Defendants could have been made. <u>See</u> <u>United States v. Robinson</u>, 2011 WL 7563020, at *3 (D. Minn. Dec. 2, 2011) <u>report and recommendation adopted</u>, No. 11-cr-325(1) (DWF/LIB), 2012 WL 948670 (D. Minn. Mar. 20, 2012). The affidavits fail to articulate the requisite probable cause necessary to support issuance of the three February 3, 2014, mouth swab DNA warrants.

However, "[u]nder the <u>Leon</u> good-faith exception, disputed evidence will be admitted if it was objectively reasonable for the officer executing a search warrant to have relied in good faith on the judge's determination that there was probable cause to issue the warrant." <u>Grant</u>, 490 F.3d at 632 (<u>citing</u> <u>United States v. Leon</u>, 468 U.S. 897, 922 (1984)). Although the Court concludes that the three DNA search warrants' supporting affidavits do not set forth facts within their four corners sufficient to demonstrate probable cause for the buccal swab search warrants on the present record, law enforcement's good-faith reliance on those warrants militates against suppressing any evidence obtained in the searches. <u>See</u> <u>Leon</u>, 468 U.S. at 919-921 (exclusionary rule does not apply "when an officer acting with objective good faith has obtained a search

25

warrant from a judge or magistrate and acted within its scope"). <u>See also</u> <u>United States v.</u> <u>Johnson</u>, 219 F.3d 790, 791 (8th Cir. 2000) ("Even if we thought the warrant affidavit did not establish probable cause, the good faith exception to the warrant requirement would apply because the affidavit was sufficient to allow an officer to reasonably believe probable cause existed."); <u>United States v. Rugh</u>, 968 F.2d 750, 753 (8th Cir. 1992) ("When police objectively and reasonably believe that probable cause exists to conduct a search based on an issuing judge's determination of probable cause, evidence seized pursuant to the ultimately invalid search warrant need not be suppressed.").[6]

In his supporting affidavits, Officer Baumann articulates "probable cause" for the warrant in the form of the results of the February 2, 2014, search-and-seizures, which revealed unlawfully-possessed firearms, potentially covered in DNA.[7] When Officer Baumann successfully obtained the warrants from a Stearns County State District Court Judge, law enforcement relied in good faith on the findings of the issuing judge. Officer Baumann's supporting affidavits indicate that he presented the issuing judge with specific facts concerning underlying criminal incidents and the recovery of criminal paraphernalia believed to be, in good faith, bearing testable DNA sufficient to create probable cause in support of an application for a buccal swab search warrant. Accordingly, when executing the search warrants for mouth swabs of Defendants' DNA, law enforcement appropriately relied on the search warrants.

---

[6] "It was not unreasonable for law enforcement to be unaware of required showing of probable cause prior to seizing the DNA sample from the Defendant. The law in this area is not so clearly established that the officers could reasonably predict that the affidavit lacked sufficient indicia of probable cause." <u>Robinson</u>, 2011 WL 7563020, at *4 (quotations omitted).

[7] Officer Baumann's affidavits state that Defendants had prior felony convictions, indicating it was unlawful for Defendants to possess firearms. (Gov't Exs. 9-11).

Additionally, the Court finds no independent support for application of any of the exceptions to the <u>Leon</u> good faith rule in the present record.[8]

Because law enforcement relied in good faith on the issuance of the three mouth swab search warrants, (Gov't Exs. 9, 10, 11), the Court recommends that Defendants' motions to suppress, [Docket Nos. 39, 50, 55], be **DENIED** with respect to all three search warrants at issue.

## IV.   DEFENDANT SHELTON'S MOTION TO SUPPRESS STATEMENTS, ADMISSIONS, AND ANSWERS, [DOCKET NO. 52]

Prior to the June 27, 2014, pretrial motions hearing, Defendant Shelton moved the Court for an order (1) directing the Government to inform Defendant of the existence of any statements, admissions, or answers made by Defendant Shelton, and any evidence derived from or discovered as a result of any such statements, admissions, or answers; and (2) suppressing illegally obtained statements, admissions, answers, and any and all evidence procured as a result thereof. (<u>See</u> [Docket No. 52]).

Defendant Shelton makes no specific argument regarding any statements, admissions, or answers in his supplemental briefing to the Court, aside from a footnote mentioning that statements obtained as a result of information from the allegedly illegal initial vehicle stop/search or other unlawful means should be suppressed as fruit of the poisonous tree: "The evidence of a DNA swab of Mr. Shelton and his cell phone records, all obtained as a result of information from the unlawful stop and search used in search warrants, should also be suppressed as fruit of the poisonous tree. <u>The same holds true for Mr. Shelton's statements</u>." (<u>See</u>

---

[8] See <u>Leon</u>, 468 U.S. at 923 (exceptions to the good faith rule when issuing judge "was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard for the truth," "where the issuing magistrate wholly abandoned his judicial role," or when the warrant is "so facially deficient – i.e., in failing to particularize the place to be searched or the things to be seized – that the executing officers cannot reasonable presume it to be valid").

[Docket No. 88], at 19, n.2) (emphasis added). However, as discussed above, the Court finds that neither the initial vehicle stop nor the vehicle "search" were illegal or otherwise in violation of Defendant Shelton's constitutional rights. Accordingly, the Court finds no reason to apply the "fruit of the poisonous tree" doctrine to any statements made by Defendant Shelton.

Because Defendant Shelton does not offer any other sufficiently specific factual or legal grounds for suppression of any statements, admissions, or answers, the Court recommends summarily **DENYING** Defendant Shelton's Motion to Suppress Statements, Admissions, and Answers, [Docket No. 52], on the basis that Defendant has failed to meet his burden of production. Jones, 2009 WL 4723341, at *4 (citing Mims, 812 F.2d at 1074; Quiroz, 57 F. Supp. 2d at 822-23).

## V.   CONCLUSION

Based on the foregoing, and all the files, records and proceedings herein, **IT IS HEREBY RECOMMENDED**:

1. That Defendant Banner's Motion for Severance, [Docket No. 37], be **DENIED** without prejudice;

2. That Defendant Banner's Motion to Suppress Evidence Obtained as a Result of Search and Seizure, [Docket No. 39], be **DENIED**;

3. That Defendant Shelton's Motion to Suppress Evidence Obtained as a Result of Search and Seizure, [Docket No. 50], be **DENIED**;

4. That Defendant Shelton's Motion to Suppress Statements, Admissions, and Answers, [Docket No. 52], be **DENIED**;

5. That Defendant Vinson's Motion to Suppress Physical Evidence Obtained as a Result of Illegal Searches, Seizures, or Identification Procedures, [Docket No. 55], be **DENIED**;

6.   That Defendant Shelton's Motion for Severance, [Docket No. 63], be **DENIED** without prejudice; and

7.   That Defendant Vinson's Motion for Severance, [Docket No. 64], be **DENIED** without prejudice.


Dated: August 28, 2014                                    s/Leo I. Brisbois
                                                          Leo I. Brisbois
                                                          U.S. MAGISTRATE JUDGE


# N O T I C E

Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **September 11, 2014**, a writing that specifically identifies the portions of the Report to which objections are made and the bases for each objection. A party may respond to the objections by **September 25, 2014, or within fourteen (14) days** of service thereof. Written submissions by any party shall comply with the applicable word limitations provided for in the Local Rules. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals. This Report and Recommendation does not constitute an order or judgment from the District Court, and it is therefore not directly appealable to the Court of Appeals.